# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

---

CASE NO. *5:19 CV 00442*

---

**KALEB S. B/N/F KATHLEEN S.,**
**Plaintiff**

**Vs.**

**SAN ANTONIO INDEPENDENT**
**SCHOOL DISTRICT,**
**Respondent**

---

## APPELLANT'S ORIGINAL COMPLAINT

---

**ISSUE:** whether placement in a behavior unit on another campus constitutes a free and appropriate public education in the least restrictive environment.

---

**ATTORNEY FOR APPELLANT**

**Karen Dalglish Seal**
**State Bar No. 24000207**
**202 East Park Avenue**
**San Antonio, Texas 78212**
**Office: (210) 226-8101**
**Facsimile: (210) 226-8101**
**Karen@kseallaw.com**

## TABLE OF CONTENTS

TABLE OF CITATION OF AUTHORITIES…………………………………….iii

STANDARD OF REVIEW………………………………………………………1

PARTIES…………………………………………………………………… 2

STATEMENT OF CASE AND FACTS …………………………………………..2

      A. Nature of the Case………………………...……………………………..3

      B. Course of Proceedings………...……………………………………….4

      C. State of Facts……………   ………………………………………... 5

SUMMARY OF ARGUMENT……………………………………………………6

ARGUMENT……………………………………………………………….27

CONCLUSION…………………………………………………………….28

CERTIFICATE OF SERVICE AND COMPLIANCE…………….………….28

## TABLE OF AUTHORITIES

<u>Cases</u>

*Board of Educ. Of the Hendrick Hudson Central Sch. Dist. V. Rowley,* 458 U.S. 176 at 206 (1982)

*Cordrey v. R.J. Euckert,* 917 F 2d 1460, 1468 (6th Cir. 1990)

*Cypress-Fairbanks Indep. Sch. Dist. V. Michael F.,* 118 F. 3d 245, 252 (5th Cir. 1997)

*Daniel R.R. v. State Board of Education,* 874 F.2d 1036 (5 th Cir. 1989)

*Forest Grove v. T.D.,* 129 S. Ct  987 08-305, 109 LRP 13476 (2009)

*Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 108 (2d Cir. 2007)

*Hairston v. Drosick,* 423 F. Supp. 180 at 185 (1976)

*Lachman v. Illinois State Board of Education,* 852 F.2d 290, 295 (7th Cir. 1988)

*Oberti v. Board of Education of the Borough of Clementon School District,* 789 F. Supp. 1322 (D.N.J. 1992)

*P. v. Newington Bd. of Educ.,* 546 F.3d 111 (2nd Cir. 2008)

*Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir. 1983).

*Sacramento City School Dist. v. Rachel H.,* 14 F.3d 1396 (9th Cir. 1994).

*Warton v. Fairfield Bd of Educ.* 217 F. Supp. 2d 261 at 275 (D. Conn. 2002)


<u>Statutes</u>

20 U.S.C. §1401(33)

20 U.S.C. § 1415(i)(2)(C)

29 U.S.C. § 794

34 C.F.R. 104.35(a)

34 C.F.R. § 300.42

34 C.F.R. § 300.114

34 C.F.R. 300.551 (a)

Tex. Admin. Code Tit. 1989.223

**PLAINTIFF'S ORIGINAL COMPLAINT REQUESTING A DE NOVO
CONSIDERATION OF AN ADMINISTRATIVE LAW DECISION**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Petitioner, Kaleb S. b/n/f Kathleen S., who brings this
appeal de novo from an administrative decision by an administrative law
judge/hearing officer in a special education matter.  For good cause, Petitioner
would show:

## I.    PARTIES

1.    In the administrative hearing, Plaintiff was the Petitioner.  Plaintiff is
a nine year old student with special needs.  He attends school at the Advanced
Learning Academy in San Antonio Independent School District.  In this matter,
Petitioner is the Appellant.

2.    San Antonio Independent School District is located at 141 Lavaca,
San Antonio, Texas 78205.  In this matter, Respondent is the Appellee.

## II.    STANDARD OF REVIEW

3.    The standard of review is a "modified de novo" review.  The district
court is to give "due weight" to the administrative proceedings.  *Board of Educ. Of
the Hendrick Hudson Central Sch. Dist. V. Rowley,* 458 U.S. 176 at 206 (1982).  In
reviewing a decision of a hearing officer, a judge must review the administrative
record and base her or his decision on the preponderance of evidence. *Cypress-*

*Fairbanks Indep. Sch. Dist. V. Michael F.,* 118 F. 3d 245, 252 (5th Cir. 1997). A judge may, at the request of a party and at the judge's discretion, permit additional evidence to be presented.  20 U.S.C. § 1415(i)(2)(C).  In conducting the review, a judge is required to defer to the decision of the hearing officer as to the credibility of the witnesses, unless other evidence in the record would justify a contrary conclusion or unless the record, in its entirety, would dictate a contrary conclusion. However, the district court cannot accept the findings of the administrative law judge or hearing officer without conducting an independent examination of the record. *Id.*  at 387.  The standard of review applies to both the substantive and procedural inquiries of the evidence.  *Cordrey v. R.J. Euckert,* 917 F 2d 1460, 1468 (6th Cir. 1990).

## III.    STATEMENT OF THE CASE AND FACTS

4.    *Nature of the Case.*  This case is a review de novo of an administrative hearing (a due process hearing) directed under the authority of the Texas Education Agency.  Kaleb is a nine year old student in 3rd/4th grade at the Advanced Learning Academy (A.L.A.) in the San Antonio Independent School District.  He is currently receiving services as a student with special needs in a general education classroom under the eligibilities of Emotional Disturbance, Other Health Impairment and Attention Deficit Hyperactivity Disorder.  Kaleb has the most difficulties when he perceives a threat to himself by another and when he is overwhelmed. The teachers

have not been provided basic behavioral training to work effectively with this student and his principal is resistant to training.     Due to the inconsistent reinforcement of his maladaptive behavior Kaleb has not developed the emotional regulation skills to address his needs.   The District had a history of placing this student in suspensions and alternative programs.   They finally wanted to move the student to another location for 4th grade when Kaleb was not emotionally ready for 4th grade and later wanted to move him to a behavior unit.   The parent disagreed stating that the school had not made any legitimate attempts to improve the student's behavior.  He was not in one place long enough to make any behavior improvements. There were no interventions, modifications or accommodations used for a consistent period of time to help Kaleb improve his behavior skills.   In the end, the school just wanted the student off the campus.   The mother objected to the placement in a behavior unit and Kaleb was subject to "stay put" pending the resolution of this matter.  The mother filed for a due process hearing on August 31, 2018.

5.     *Course of Proceedings.*  A due process hearing was held on December 17 – 19, 2018.  The posthearing briefs were due on January 28, 2019 and the hearing officer's decision was rendered on February 4, 2019.  The hearing officer found in favor of the District.  Petitioner objected and filed a Notice of Appeal.  This appeal is limited to one issue only—whether placement in a behavior unit on another

campus constitutes a free and appropriate public education in the least restrictive environment.

6.    *State of Facts.*  Petitioner appeals only one issue—whether a behavior unit in another school is the least restrictive environment for this young man.  Kaleb has spent a considerable amount of days in the alternative school, in In School Suspension and in other inconsistent environments none of which addressed Kaleb's specific behavior needs in a manner that this child requires.  Kaleb has not received any intensive behavior treatments/therapies such as Applied Behavioral Analysis, Cognitive Behavior Therapy or Dialectical Behavioral Therapy.

7.    Historically, Kaleb has evaluation data to support his impulsivity and lack of emotional regulation.  The District's A.R.D. chose to call a manifestation meeting in the early Fall of the 2017-2018 school year.  At this meeting, the parent requested that a special education coordinator not be utilized to intervene in Kaleb's behavior plan because that particular professional had been involved in numerous incidents with Kaleb.  The committee did not discuss or consider the parent's concerns regarding whether the school complied with the behavior plan.  They conducted minimal discussion on the fact that Kaleb's behavior was substantially and directly related to the student's disability.  The A.R.D.C. did not seek to reach consensus or consider the parent's concerns.  There was a clear pattern of predetermination in the manifestation A.R.D. which the parent's advocate attempted

to address.  The school district committee did not make any substantial changes in the child's behavior plan. See A.R.D. December 15, 2018.

8.    The parent had asked that Kaleb be retained for a year.  That did not happen and Kaleb was not behaviorally ready for the behavior rigor of fourth grade. Prior to the manifestation A.R.D. meeting, the committee tried to move Kaleb to another school.  Then the school committee decided that Kaleb required a behavior unit. Almost all of the interventions attempted came after Kaleb was released from the alternative school toward the end of February 2018.  Those interventions were too few and too late.  Kaleb has not been given the opportunity to be successful behaviorally within the school program.  Further, a behavior unit is not the least restrictive environment for this young man.

## IV.    SUMMARY OF THE ARGUMENT

9.    Kaleb required a stable environment with consistent discipline in order to make progress.  The young man was not able to make steady, observable behavioral progress when he was being moved from one environment to another within the school and in the District. Kaleb did, however, make progress.  He was making behavioral progress over the time that he was at the Advanced Learning Academy which was the least restrictive environment for Kaleb. The statutory definition of the least restrictive environment (L.R.E.) is located in Section 300.114(a)(2) of the Code of Federal Regulations. It mandates that "(2) Each public

agency shall ensure (i) That to the maximum extent appropriate, children with disabilities. . . are educated with children who are nondisabled; and (ii) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." By attempting to remove Kaleb from his campus, the District was removing Kaleb from the L.R.E. The finder of fact, the hearing officer, gave credit to the District for providing supports to Kaleb when the fact is that Kaleb received too little support too late in the year. Moreover, Kaleb was out of school for almost a third of the year without supports when he was in the alternative school program.

## V.    ARGUMENT

10.    L.R.E. mandates that " (2) Each public agency shall ensure (i) That to the maximum extent appropriate, children with disabilities. . . are educated with children who are nondisabled; and (ii) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Congress made it clear in the Individuals with

Disabilities Act that there was a strong preference for students to be educated with their general education peers. In *Hairston v. Drosick*, the court applied the racial discrimination holding of *Brown v. Board of Education* to children with disabilities. The court stated that segregation is inherently unequal. *Hairston v. Drosick*, 423 F. Supp. 180 at 185 (1976). Further, the Court stated that "The exclusion of a minimally handicapped child from a regular public classroom situation without a bona fide educational reason is in violation of Title V of Public Law 93-112, "The Rehabilitation Act of 1973," 29 U.S.C. § 794. The federal statute proscribes discrimination against handicapped individuals in any program receiving federal financial assistance. To deny to a handicapped child access to a regular public school classroom in receipt of federal financial assistance without compelling educational justification constitutes discrimination and a denial of the benefits of such program in violation of the statute. School officials must make every effort to include such children within the regular public classroom situation, even at great expense to the school system." *Id.*

11.    L.R.E. provides a balance between ensuring that students receive academic benefit from their placement through appropriate supports, services and curriculum and allowing those students with disabilities to interact with non-disabled peers so that children with special needs can grow emotionally and socially. The

L.R.E. is the appropriate placement not only at times when the placement meets the student's educational needs but also when it addresses social and emotional needs. [1]

12.     The federal law defines supplementary aids and services very broadly as: "aids, services, and other supports that are provided in regular education classes or other education related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate..." [20 U.S.C. sec. 1401(33); 34 C.F.R. secs. 300.42 & 300.114.] Examples of supplemental aids and services that might be used to assist special education students in regular classes include, but are not limited to: a structured learning environment, repeating and simplifying instructions about in-class and homework assignments, supplementing verbal instructions with visual instructions, using behavioral management techniques, adjusting class schedules, modifying test delivery, using tape recorders, computer-aided instruction and other audio-visual equipment, modified textbooks or workbooks, tailoring homework assignments, reducing class size, use of one-on-one tutorials, classroom aides and note takers, involvement of a "services coordinator" to oversee implementation of special programs and services, modification of nonacademic times (such as lunchroom, recess and physical

---

[1] Mark C. Weber, 5 the Least Restrictive Environment Obligation as an Entitlement to Educational Services; a Commentary. (2nd Ed. UC Davis Jour of Juvenile Law & Policy 2001)

education). [U.S. Department of Education, Office of Special Education and Rehabilitative Services, Policy Memorandum, September 16, 1993.]

13. In *Roncker v. Walter*, a school district tried to find an appropriate placement for a student on the autism spectrum. The court determined that children with special needs should be educated to the maximum extent appropriate with non-disabled peers. The test that the circuit court set forth addressed whether superior services provided by a segregated setting could be modified and provided in a general education setting successfully. If those services could allow the student to receive services in general education then the student should be in that setting. The court added that removal from general education should only occur if education in general education was not possible due to the nature and severity of the disability. The court noted, "The Act does not require mainstreaming in every case but its requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference." *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983).

14. In *Daniel R.R. v. State Board of Education*, the court applied the *Roncker* test to a child in kindergarten to determine whether his placement should be in a special education or mainstream class or some combination. The court concluded that Daniel was not making progress in a general education class. As a result, general education was not an appropriate setting. *Daniel R.R. v. State Board*

*of Education*, 874 F.2d 1036 (5th Cir. 1989). The 5th Circuit had adopted the *Daniel R.R.* test. *Sacramento City School Dist. v. Rachel H.* 14 F.3d 1396 (9th Cir. 1994).

15.     The case that combined the factors to consider in the *Ronker* and *Daniel R.R.* into a four part test was *Sacramento City School Dis. V. Rachel H.* The 9th Circuit determined that the lower courts must weigh four factors to determine whether the proposed placement of a student was appropriate.  The four part test include (1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect the child had on the teacher and children in the regular classroom (4) the costs of mainstreaming. *Sacramento City School Dist. v. Rachel H.*, 14 F.3d 1396 (9th Cir. 1994).

16.     **Other factors that courts have acknowledged as essential to making the determination of placement include:**

a.     If the student did not make enough behavioral progress, were there additional services which would have improved his performance? *P. v. Newington Bd. of Educ.*, 546 F.3d 111 (2nd Cir. 2008). In *Newington v. Bd. of Educ.*, the Second Circuit noted that the finder of fact must determine whether "reasonable efforts [were made] to accommodate [the student] in a regular classroom. *Id.* at 120. In *Warton v. Fairfield Bd. of Educ.*, the court stated, "[i]he IDEA does not permit token gestures to accommodate disabled students." *Warton v. Fairfield Bd of Educ.* 217 F. Supp. 2d 261 at 275 (D. Conn. 2002). In the *Ronker v. Walter*

opinion, that court said, "In a case where [a] segregated facility is considered [academically] superior, the court should determine whether the services which make the placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the [law]. *Roncker v. Waller*, 700 F.2d 1058, 1058 (6th Cir. 1983).

b.    Whether the benefits received from a special education far outweigh any marginal benefits received from inclusion in a general education setting which could not feasibly be provided in the non-segregated setting. The Second Circuit stated that, in developing an individualized education program, Districts must "... be mindful of IDEA's strong preference for 'mainstreaming,' or educating children with disabilities the maximum extent appropriate' alongside their non-disabled peers." (quoting 20 U.S.C. 1412(a)(5) (alteration in original)). See also *Lachman v. Illinois State Board of Education*, 852 F.2d 290, 295 (7th Cir. 1988). ("[IDEA's] requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference. " (emphasis omitted)).

c.    What steps has the district taken to accommodate the student and were the efforts sufficient or token? *Daniel R.R. v. State Bd. of Educ.* 874 F.2d 1036, 1048 (5th Cir. 1989). "The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying

and supplementing regular education is broad. See 34 C.F.R. Part 300, App. C

Question 48. Texas expressly requires its local school districts to modify their

regular education program when necessary to accommodate a handicapped child,

Tex.Admin.Code Tit. 1989.223

    d.    Whether the district offered a continuum of education alternative

placements and related services to meet the needs of students with disabilities. 34

C.F.R. 300.551 (a). "The continuum must include alternative placements and

supplementary services in conjunction with regular class placements and

supplementary services in conjunction with regular class placement. [d.

300.551(b). *Daniel R.R.*, 874 F.2d 1036, 1048 (5th Cir. 1989)(noting that education

in the regular education classroom, with supplemental aids and services, can be

achieved satisfactorily is an "individualized, fact specific inquiry"). Furthermore,

federal special education law "requires school systems to supplement and realign

their resources to move beyond those systems, structures and practices which tend

to result in unnecessary segregation of children with disabilities." *Oberti v. Board*

*of Education of the Borough of Clementon School District*, 789 F. Supp. 1322

(D.N.J. 1992). The Third Circuit added that "[T]he Act's strong presumption in

favor of mainstreaming...would be turned on its head if parents had to prove that

their child was worthy of being included, rather than the school district having to

justify a decision to exclude the child from the regular classroom. *Oberti v. Board*

*of Education*, 995 F.2d 1204 (3rd Cir. 1993). The statutory presumption in favor of

mainstreaming has been constituted as imposing a burden on the school district to prove that a child cannot be mainstreamed. *See Sacramento City Unified School District v. Rachel Holland*, 786 F. Supp. 874 (E.D. Cal. 992).

  f.  Whether the District considered that Kaleb was being removed from the general education only after determining that the use of supplementary aids and services cannot be achieved satisfactorily. 20 1412(5)(B).

  g.  Whether the District failed to evaluate the student before removing him from the general education classroom pursuant to 34 C.F.R. 104.35(a). *Forest Grove v. T.D.*, 129 S. Ct 987 08-305, 109 LRP 13476 (2009).

  **17. If the student did not make enough behavioral progress, were there additional services which would have improved Kaleb's performance?**

  <u>Respondent should have provided services sooner and at the level recommended by the previous school district</u>. Kaleb did not receive any special education services from the first day he arrived at ALA until October 13, 2017 when the transfer A.R.D. occurred. Although there was a dispute about when the school knew that Kaleb should be receiving services, the mother stated she spoke to the school in March 2017 prior to Kaleb's enrollment and handed them a binder with all of Kaleb's ARDs and documents. The school stated they did not remember receiving anything but Respondent obviously knew to request the records from Dallas I.S.D. They also knew to tell the Kaleb's mother that they had to wait for

the records. They did not do a transfer A.R.D. until they received a copy of the student's paperwork. The documents the Respondent received mentioned that Kaleb received speech at the rate of eight thirty minute sessions per six weeks. He also received reading support. The Dallas information also clearly stated that "his accommodations were to 'establish a calm, relaxed atmosphere", ' speak in a relaxed, unhurried way, pausing frequently when talking, and try not to interrupt Kaleb when he is speaking'". Respondent continued the 60 minutes of reading support but decreased the speech from eight times per six weeks to eight times per nine weeks and did not add any accommodations that might have reduced the student's frustrations and his outbursts. Pet. Vol. l, Tab 12, p. 12-1, 12-2. Apparently, there were no behaviors which were considered serious since nothing else was done, until the A.R.D. of November 10, 2017. Pet. Vol. l , Tab I l , p. l 1l. There were no accommodations and less speech which, if services had been provided, might have reduced frustration and anxiety and avoided some behavior issues. Behavior is commnnication. It should be noticed that the three accommodations provided by Dallas I.S.D. were never incorporated into Kaleb's A.R.D. documents in S.A.I.S.D. There was no request for an FBA in that original transfer A.RD. or in the November 10, 2017 A.R.D. Pet. Vol. 1, Tab 12, p. 12-1, 12-2. Pet. Vol. l, Tab I l . The few behaviors discussed included difficulties with transitions and "impulsive frustration and anger". At that time, solne minor

accommodations were Inade for the behaviors but again, not the accornmodations that had worked in Dallas I.S.D. Pet. vol. 1, Tab. 11, p. 11-4.

17.    Based upon the fact that services through special education were not started until October 13, 2017, Kaleb missed services at the first of the year during a key transitional time period and it noted in the hearing that Kaleb does not do well with transitions. Trans. Vol. 1, p. 143, ll. 6-10. Then services were minimal for another month when at the November A.R.D.C. meeting, the Respondent dropped speech services to once every two weeks per eight weeks of the nine week grading period based on no additional testing or documentation. Pet. Vol. 1, Tab 11, p. 11-1. The A,R.D.C. indicated that no behavior plan was needed at that time. Pet. Vol. t, Tab I l, p. 11-1]. From the record that was presented, there was no reason to believe that Kaleb had a serious behavior issue.

18. The first notice of any serious behavior issue came at the manifestation review A.R.D. called a "Revision to the Annual A.R.D." on December 15, 2017 wherein the committee noted that there were behavior changes in Kaleb since the last A.R.D. Pet. Vol. 1, Tab 10, p. 10-1. The behavior in question at the A.R.D. meeting occurred in December 2017 less than three weeks after the last A.R.D. meeting on November 10, 2017. Pet. Vol. I, Tab 10, p. 10-2. The deliberations centered around whether or not Kaleb felt remorse for the behavior although the committee did indicate that they addressed the question about whether the behavior

was the result of Kaleb's ADHD. The A.R.D.C. did state that they had done additional evaluations to determine if Kaleb had an emotional disturbance. There were no notes regarding the types of evaluations or why the A.R.D.C. made its determination, The A.R.D.C. focused on a "lack of remorse". Pet. Vol. I , Tab 10, p. 10-2 and 10-9. The found that he did not qualify as E.D. Pet. Vol. I , Tab 10, p. 10-2. The Respondent did add a behavior plan to Kaleb's program Kaleb's mother testified that her son's accommodations and services were not provided at the Alternative school except for speech which was limited to two visits. Trans. Vol. 1, p. 248.  In fact, the mother in uncontroverted testimony, stated that the principal of the DAEP stated that "I don't know if you understand what this place is. This is not a place where we address special needs". Trans. Vol. 1, p. 249 ll. 6-12. At that point, Kaleb had missed the first part or the school year receiving special education services he should have been receiving plus the 28 school days in the DAEP.

19.     The next A.R.D. meeting was held on January 26, 2018 while Kaleb was at the alternative school and at the request of the mother who expressed concerns about the student's return to ALA. At that time, the mother requested a functional behavior assessment which the school agreed to provide. Pet. Vol. 1 , Tab 9, p. 9-2. The mother testified that Kaleb did not receive social skills at the alternative school. The associate principal testified that she did not know whether or not services were provided at the alternative school. Trans. Vol. 3, p. 691, ll. I2. The mother made the request that Kaleb be moved to the second grade. She felt that Kaleb's interactions

were more in line with second grade students where he had friends. That request was denied. Pet. Vol. 1, Tab 9, p. 9-2. The mother further requested that Kaleb be held back the following year in third grade. That request was denied. Pet. Vol. 1, Tab 9, p. 9-2.

20.    The next A.R.D. meeting occurred on February 16, 2018. At that time, Kaleb had not mastered any of his current goals. Pet. Vol. 1, Tab 8, p. 8-4 to 8-5. The committee agreed to provide Kaleb with social skills on a one-to-one basis with a staff member. The FBA had not been completed at this time. The plan was to go into effect on February 20, 2018. Kaleb would have a behavior report card that he would carry with him so that he could gain points to earn rewards for good behavior. Resp. Vol. 1, Tab 6, p. 6-2. According to the records provided by the school and according to the mother and the data sheets, Kaleb was earning those rewards and doing fine behaviorally the vast majority of the time.

21.    As of the end of February, reasonable efforts had not been made to accommodate Kaleb. Kaleb had engaged in behavior that the A.R.D.C. felt was best addressed by sending the student to the DAEP but almost nothing was done. There was little documentation. There was no counseling. The student had not been given the opportunity to receive social skills instruction or any instruction in a smaller, special education setting. An FBA had just been started. The B.I.P. was not based on documentation because data collection was sketchy in the Fall. Pet.

Exh. 25, pp.25-120 to 25-128. And, the next A.R.D. did not convene until April 9, 2018 when the FBA was completed. Resp. Vol. l, Tab 5, p. 5-2. At that time, the plan was to keep Kaleb at ALA. Resp. Vol. 1, Tab 5, p. 5-5. Further, it was not until the April 9, 2018 A.R.D. that counseling was added to Kaleb's schedule of services. The counseling was determined to be needed one titne per week for twelve weeks. Resp. Vol. 1, Tab 5, p. 5-5.

22.       The committee met again on May 11 (a month after the last A.R.D. and after only four counseling sessions). Everything changed. The mental health aide who came to work with Kaleb according to testimony, had not even been placed with Kaleb yet. The A.R.D.C. ended in disagreement and at the May 30, 2018 Reconvene A.R.D., the recommendation was to keep Kaleb in all general education classes. Resp. Vol. 1, Tab 4, p. 4-2. The mental health aide had just been placed with Kaleb at the end of May and counseling had begun in April. Even the Special Education Director, Beth Jones, acknowledged that "counseling as a service it could have been started earlier." Trans. Vol. 3, p. 947, ll. 11-12. She also acknowledged that the MHA had not been placed with Kaleb

23.       It should be noted that at the May 30, A.R.D.C. meeting, the committee noted answered "yes" to all of the following questions:

1. Were these efforts to modify and supplement the student's participation in the general education setting sufficient?
2. Will the student receive an educational benefit from participation in the general education setting (including non academic benefit)?

3. The A.R.D. Committee has considered the effect the presence of this child with a disability has on the general education classroom and thus, on the education that the other children are receiving.

24.    Finally, the committee adds, "His I.E.P. goals and accommodations address these behaviors to increase safety in the classroom." The committee noted that the staff needed no further training and recommended full time general education classes. Resp. Vol. 1, Tab 4, p. 4-6 and 4-19 respectively. Then again, a week and a half later on June 12, 2018, the A.R.D.C. responded in the affirmative to all of these questions. Resp. Vol. 1, Tab 3, p. 3-17. The committee also recommended fulltime in general education for the 2018-2019 school year. Resp. Vol. 1, Tab 3, p. 3-20. Extended School Year services were also not recommended at this A.R.D. meeting. Resp. Vol. 1, Tab 3, p. 3-20. That was the final A,R.D. for the last school year. It was not until the next school year 2018-2019, after Kaleb had been out of school for two and half months, before Kaleb returned to school that an A.R.D. convened to move Kaleb from full time general education recommended by his last two A.R.D. committees to full time behavior class on another campus. Resp. Vol. 1, Tab 2, p. 2-17. Suddenly, after the summer with no contact with the school district, Kaleb's A.R.D. decided that the appropriate placement for Kaleb would be in special education full time.  They placed the student on another campus using one member who was not Kaleb's previous teacher. Resp. Vol. 1, Tab 2, p.2-25.

25.     **What else could the school have done to accommodate this student?**

The district could have provided additional training to its staff. It could have provided accommodations in nonacademic settings where the student had the majority of his behavior issues. According to an expert, Ms. Levay, that service was never provided. Trans. p. 139, ll. 24-25, p. 140, ll. l, 6-9, 18-20. The Respondent could have provided supplementary aids and services during transitions and less structured times. That was not done. Transcript p. 143, ll. 1-5. And, those particular times were when the student had behavior issues. Transcript p. 143, ll. 6-7.

26.     Respondent could have provided appropriate extended year services. Ms. Levay testified, "We strongly recommended and begged for . . . appropriate extended year services for him. Transcript p. 141, 11. 15-18. Further the June 12, 2018 A.R.D. specifically noted, "ESY consideration is not recommended by either parent or school. Resp. Vol. l, Tab 3, p. 3-20. The A.R.D. that immediately preceded the June A.R.D., the May 30, 2018 A,R.D. and the April 9, 2018 A.R.D. did not recommend extended school year services either. Resp. Vol. l , Tab 4, p. 419 and Resp. Vol. 1, Tab 5, p. 5-5.

27.     Kassandra Levay stated that first one needed "good data collection and effective strategies. You need to know what the antecedent [of the behavior] is. You need to know exactly what the behavior is." Transcript p. 132, ll. 20-23. She

further explained the person reading the data should be able to interpret the data such that it is obvious what the adult did in response to that behavior. Finally, one needs to know if the intervention worked and "if it doesn't work, stop doing it." Transcript p. 132, ll. 20-25. The first service that needed to be provided is accurate data collection and Kassandra Levay, in her testimony, indicated that the school failed to provide that service. Transcript p. 116, 11. 23-25, p. 117, 11. 1-2, 5-7, 17-24, p. 1 18, ll. 2-3, 5-6, 13-17, 19-25, p. 1 19, 11. 2-5, 15-16, 19-25, p. 120, ll. 11, 16-21, p. 121, ll. 12-15, 21-25, p. 122, ll. 23-25, p. 123, ll. 1-2, 5-7, 19-22, p. 124, ll. 17-20, p. 125, 11. 3-6, 8-9, 14-17, p. 127, ll. 1 1-17. Victoria Hatcher, another educational expert, noted how important good documentation collection is. Trans. Vol. l, p. 181, ll. 3-12.

28.    Ms. Levay spent quite a bit of time discussing the fallacies of the functional behavior plan. Then the questions were directed toward specific errors in the behavior plan that was developed based upon the FBA. There were multiple days where the student was having behavior issues of some type based on disciplinary reports but the data collected pointed to a perfect day. Transcript p. 128, 11. 12-24, p. 129, ll. 3-25, p. 130, ll. 21-23, p. 131, ll. 1-10, 18-23, 18-23, p. 134, ll. 15-24, p. 135, 11. 6-25, p. 136, p. 2-10, 19-24, p. 137, 11.1 -8, p, 484, ll. 24-25, p. 485, 11. 1-2, p. 499, 11. 3-8, p. 500, 11. 18-22, p. 502, ll. 23-25 and p. 503, ll. 1-8, p. 537, Il, 2-15. The school district could not accurately track the

behaviors. Even Jessica Van Hoozer, Kaleb's special education teacher, testified that data needed to be consistent on all documentation. Trans. p. 477, ll. 10-13. Moreover, Kaleb was receiving rewards for great behavior on days that the school did not actually consider to be successful behavior days. This left Kaleb confused about what was expected of him. The regular grades of 70, 80 or 90 meant nothing to the District personnel but had Kaleb believing he was successful. Trans. p. 537, ll. 3-16. Aric Diaz, the mental health aide (MHA), testified twice that Kaleb was doing better this school year (20182019). Trans. p. 533, ll. 18-19, p. 546, ll. 11-12. When asked if it would sutprise the MHA that Kaleb's behavior scores averaged over 90%, Mr. Diaz stated it would not. Trans. p. 533, ll. 7-17. He admitted that he did not keep the behavior logs. Trans. p. 534, ll. 1 1-16. The remainder of the testimony from the MHA was descriptive of behaviors that would not have earned Kaleb the points he was making. Cf. Aric Diaz's testimony (No point sheets and those grades. Mr. Diaz did add that he had not had to restrain Kaleb even once this school year. Trans. p. 552, ll. 15-16.

29.    **What steps has the district taken to accommodate the student? Were the efforts sufficient or token?** Beth Jones, the executive director of special education elementary school, testified as to what supports and services had been tried to accommodate Kaleb. She mentioned a mental health aide (MHA) who also testified at the hearing. Further, the associate principal stated that a crisis sub was

in place who was supposed to come after Kaleb returned from DAEP but that person did not start until mid-March. Trans. Vol. 3, p. 648, ll. 18 and p. 649, ll. 1-6. The question regarding the accommodation can be addressed simply by noting that Beth Jones testified that the MHA was not provided in the classroom with the student until the last two weeks of school. That support was merely a token. In the A.R.D. on 8/27/2018, the A.R.D.C. noted that Supplementary Aids and Services were not provided in the nonacademic environment and neither were accommodations.   That fact was consistent through all of the 2017-18 school year A.R.D. meetings. Assistive Technology was merely "considered". Resp. Vol 1, Tab 1, p. 1-20. In the A.R.D. document, the A.R.D.C. notes "Placement in the general education classroom prohibits the student from achieving all goals/objectives in his/her I.E.P. even though supplementary aids and services are used." Resp. VI, p. 1-21. *Cf* the notation in the May 30, 2018 A.R.D. above that states the efforts were sufficient. Since those supplementary aids and services were not used in nonacademic environments, Respondent failed to provide a continuum of supports and, obviously, the Respondent did not feel that the student needed supports in unstructured times or nonacademic classes.

30.    Interestingly, the associate principal at ALA testified that when Kaleb's mother was called, all the mother had to say was "'Kaleb' or snap or walk in the room and Kaleb would cease doing whatever it was that he was doing". Trans. Vol.

3, p. 688, ll, 20-22. Victoria Hatcher, a master's level teacher. suggested that the school should inquire as to how the mother or somebody else who has successfully worked with Kaleb is able to calm the student down. Trans. Vol. 1, p. 180, ll. 17-25. Kaleb be allowed to Inove around more. Trans. Vol. 1, p. 178, ll. 4-6. She suggested that gifted and talented children like Kaleb need to be taught in different ways. Trans. vol. 1, p. 178, 11. 24-25 and p. 179, ll. 1-4. Ms. Hatcher stated that Kaleb required immediate rewards and positive reinforcement. Trans. Vol. 1, p. 178, Il, 4-6. Ms. Hatcher stated the behaviors should be "addressed immediately and exactly in the same way." Trans. Vol. 1, p. 191, ll. 8-10. Both Ms. Hatcher and Mrs. Stellema stated that giving Kaleb responsibility/leadership was positive. Trans. Vol. 1, p. 185, ll. 14-15. She also suggested a social skills class where Kaleb had the opportunity to practice his skills with a small group of students. Trans. Vol. 1, p. 190, ll. 13-15.

31.      Kaleb is also the child who had several people testify on his behalf. His neighbor, Bonnie Heofer described Kaleb as delightful, behaved, creative and a friend. Trans. Vol. 2, pp. 274-287. Patricia Sanchez, who has a son who is a friend of Kalebs, testified that Kaleb was well behaved and who was welcome in their home. Trans. Vol. 2. Pp. 561-567. Mike Paloma, the karate instructor, testified that Kaleb followed instructions and did well in his classes. Trans. Vol. 2, pp. 95-103. Surely, there existed a means of controlling this child's behavior when no one

outside of the school had difficulties with Kaleb and his mother could get instant obedience when the school invited her to come in and take control of the student.

32.     Apparently, some steps were taken to provide Kaleb with some special education services but not appropriate ones and they were only tried for a brief period of time. Further, despite the claims that Kaleb was a serious behavior issue, nothing more was done. However, rather than moving the student from all general education classes, the school could have offered time in a behavior class in ALA. Dr. Kenneth Matthews suggested a class where Kaleb touched base each day, received instruction on behavior and then ended the day in the same class. The A.R.D.C. could have followed the recommendations of their occupational therapist and added the accommodations she suggested. Resp. Vol. 1, Tab 1, p. 1-5. Handwriting was very frustrating to this student but not one accommodation was found on the accommodation page. Resp. Vol. 1, Tab l, p. 1-16. The A.R.D.C. did not suggest moving the student to his actual home campus with more time in special education. Instead, they jumped straight from the May 30, 2018 and June 12, 2018 A.R.D.s and all general education to an August 27, 2018 A.R.D. where they recommended all special education, at another campus (not the actual home campus) in a behavior class. The A.R.D.C. made that decision without even attempting extended school year services. They made that change while making the following statements:

"Kaleb transfers from the general education classroom to the Speech Therapy room . He often requires encouragement and moderate redirection." Resp. Vol. 1, Tab 1, p. 1-2.

"Kaleb has shown improvement in sharing his emotions orally and sometimes in writing." Resp. Vol. l, Tab 1, p. 1-6.

"Student attended San Antonio Academy for 3 weeks with few incidents and with the ability to be redirected." Resp. Vol. 1, Tab 1, p. 107.

By the November 1, 2018 A.R.D., the committee was saying: "Kaleb is an enthusiastic reader" Pet. Vol. 1, Tab l , p. 1-2.

"performing on grade level" Pet. Vol. 1, Tab 1, p. 1-2.

"His behavior, with regards to following directions and completing his work, Is consistently good." Pet. Vol. 1, Tab 1, p. 1-2.

"Kaleb allows the classroom GE teacher to redirect him with little or no argument." Pet. Vol. 1, Tab 1, p. 1-2.

"Kaleb is very bright and a joy to work with." Pet. Vol. l, Tab l, p. 1-3.

"Kaleb has made great progress in speech and enjoys small group and being a part of speech therapy sessions." Pet. Vol. 1 , Tab l , p. 1-3.

33.     The *Roncker* court determined that children with special needs should be educated to the maximum extent appropriate with non-disabled peers. The test that the circuit court set forth addressed whether superior services provided by a segregated setting could be modified and provided in a general education setting successfully. If those services could allow the student to receive

services in general education then the student should be in that setting. The A.R.D.C. that met on August 27, 2018 did not check the box that indicated that "services and/or therapies in the student's I.E.P. cannot be provided on a general education campus." Resp. VI, p. 1-21. The May 30, 2018 A.R.D. repeated that sentiment. Resp. Vol. I, Tab 4, p. 4-16. Based on that last fact alone, Kaleb should not be attending a behavior class on another campus.

## IV.   CONCLUSION

34.    Kaleb is a young man who is bright and inquisitive.  He is praised highly for his social skills by adult friends and peers.  By keeping Kaleb out of his classroom and off of his campus for a large portion of the school year, the student, who already had some emotional challenges, had become frustrated.  His mother and her advocate objected to moving Kaleb from all general education placement to a complete self contained class on another campus far away from the students he had grown to know and befriend.  The parent and advocate knew that, by using the correct behavior techniques and documenting progress, the student could learn to control his impulsivity.  By the parent taking the step to file for a hearing and then requesting an appeal, Kaleb had the time and the opportunity to think and learn. The school personnel began to really work with Kaleb and his behavior issues. Kaleb's behavior began to change for the better at school.  Kaleb's behavior changed so much that, at the March 4, 2019 A.R.D. meeting, nothing was mentioned about Kaleb's

behavior.  There were no complaints, no comments.  That fact, explains in large part, where the problem lied.  Obviously, the school personnel could have engaged in the same interventions much earlier.  They simply found it easier to try to remove a bright student with some challenging behaviors rather than expend the energy to teach this student how to behave properly in a school environment.

35.    Appellants request that the Court consider further evidence of behaviors in order to determine whether or not a self-contained classroom on another campus is appropriate for Kaleb or whether that Kaleb would benefit from remaining with his peers, in his current school with appropriate supports and services.

**PRAYER**

Appellant prays that Kaleb remain in the school where he is currently placed, the Advanced Learning Academy in SAISD, that Respondent pay attorney fees and costs of the due process hearing and appeal, that Appellant be permitted to present additional evidence and that Appellant be awarded whatever else they may be allowed in equity or law.

Respectfully Submitted

The Law Office of Karen Dalglish Seal

202 East Park Avenue
San Antonio, Texas 78212
Office:  (210) 226-8101
Facsimile:  (210) 226-8101
Karen@kseallaw.com

*K. Seal*

Karen Dalglish Seal
SBN 24009207
Attorney for Appellants

## NOTICE OF SERVICE AND COMPLIANCE

A true and correct copy of the above complaint was sent to Stacy Ferguson at Escamilla and Poneck, PLLC by email on April 26, 2018.

The complaint consists of less than 13,000 words in Times New Roman font 14pt in compliance with the rules.

*K. Seal*

Karen Dalglish Seal

29